BREEDLOVE *v.* SUTTLES, tax-collector.

No. 11456.   October 14, 1936.

*J. Ira Harrelson,* for plaintiff.

*Carter, Carter & Johnson,* for defendant.

BECK, Presiding Justice. The questions involved in this case by the objections raised as to the constitutionality of certain provisions of our law have been discussed by able text-writers and in many judicial opinions rendered by the courts of this country. In one part of his work on Constitutional Limitations, 1358-1370, the eminent writer, Justice Cooley, says:

"We have said, that, though the sovereignty is in the people, as a practical fact it resides in those persons who by the constitution of the State are permitted to exercise the elective franchise. The whole subject of the regulation of elections, including the prescribing of qualifications for suffrage, is left by the national constitution to the several States, except as it is provided by that instrument that the electors for representatives in Congress shall have the qualifications requisite for electors of the most numerous branch of the State legislature, and as the fifteenth amendment forbids denying to citizens the right to vote on account of race, color, or previous condition of servitude. Participation in the elective franchise is a privilege rather than a right, and it is granted or denied on grounds of general policy; the prevailing view being that it should be as general as possible consistent with the public safety. Aliens are generally excluded, though in some States they are allowed to vote after residence for a specified period, provided they have declared their intention to become citizens in the manner prescribed by law. The fifteenth amendment, it will be seen, does not forbid denying the franchise to citizens except upon certain specified grounds, and it is matter of public history that its purpose was to prevent discriminations in this regard as against persons of African descent. Minors, who equally with adult persons are citizens, are still excluded [as were also women before the adoption of the nineteenth amendment]; and sometimes persons who have been

convicted of infamous crimes [are excluded]. . . In some States laws will be found in existence which, either generally or in particular cases, deny the right to vote to those persons who lack a specified property qualification, or who do not pay taxes. In some States idiots and lunatics are also expressly excluded; and it has been supposed that these unfortunate classes, by the common political law of England and of this country, were excluded with women, minors, and aliens from exercising the right of suffrage, even though not prohibited therefrom by any express constitutional or statutory provision. Wherever the constitution has prescribed the qualifications of electors, they can not be changed or added to by the legislature, or otherwise than by an amendment of the constitution. One of the most common requirements is, that the party offering to vote shall reside within the district which is to be affected by the exercise of the right. If a State officer is to be chosen, the voter should be a resident of the State; and if a county, city or township officer, he should reside within such county, city, or township. This is the general rule; and for the more convenient determination of the right to vote, and to prevent fraud, it is now generally required that the elector shall only exercise within the municipality where he has his residence his right to participate in either local or general elections. Requiring him to vote among his neighbors, by whom he will likely be known, the opportunities for illegal or fraudulent voting will be less than if the voting were allowed to take place at a distance and among strangers. And wherever this is the requirement of the constitution, any statute permitting voters to deposit their ballots elsewhere must necessarily be void. . .

· "While it is true that the legislature can not add to the constitutional qualification of electors, it must nevertheless devolve upon that body to establish such regulations as will enable all persons entitled to the privilege to exercise it freely and securely, and exclude all who are not entitled from improper participation therein. For this purpose the times of holding elections, the manner of conducting them and of ascertaining the result, are prescribed, and heavy penalties are imposed upon those who shall vote illegally, or instigate others to do so, or who shall attempt to preclude a fair election or to falsify the result. The propriety, and indeed the necessity, of such regulations are undisputed. In some of the

States it has also been regarded as important that lists of voters should be prepared before the day of election, in which should be registered the name of every person qualified to vote. Under such a regulation, the officers whose duty it is to administer the election laws are enabled to proceed with more deliberation in the discharge of their duties, and to avoid the haste and confusion that must attend the determination on election day of the various and sometimes difficult questions concerning the right of individuals to exercise this important franchise. Electors, also, by means of this registry, are notified in advance what persons claim the right to vote, and are enabled to make the necessary examination to determine whether the claim is well founded, and to exercise the right of challenge if satisfied any person registered is unqualified. When the constitution has established no such rule, and is entirely silent on the subject, it has sometimes been claimed that the statute requiring voters to be registered before the day of election, and excluding from the right all whose names do not appear upon the list, was unconstitutional and void, as adding another test to the qualifications of electors which the constitution has prescribed, and as having the effect, where electors are not registered, to exclude from voting persons who have an absolute right to that franchise by the fundamental law. This position, however, has not been generally accepted as sound by the courts. The provision for a registry deprives no one of his right, but is only a reasonable regulation under which the right may be exercised. Such regulations must always have been within the power of the legislature, unless forbidden. Many resting upon the same principle are always prescribed, and have never been supposed to be open to objection. Although the constitution provides that all male citizens twenty-one years of age and upwards shall be entitled to vote, it would not be seriously contended that a statute which should require all such citizens to go to the established place for holding the polls, and there deposit their ballots, and not elsewhere, was a violation of the constitution, because prescribing an additional qualification, namely, the presence of the elector at the polls. All such reasonable regulations of the constitutional right which seem to the legislature important to the preservation of order in elections, to guard against fraud, undue influence, and oppression, and to preserve the purity of the ballot-box, are not only within the constitutional power of the

legislature, but are commendable, and at least some of them absolutely essential. And where the law requires such a registry, and forbids the reception of votes from any persons not registered, an election in a township where no such registry has ever been made will be void, and can not be sustained by making proof that none in fact but duly qualified electors have voted. It is no answer that such a rule may enable the registry officers, by neglecting their duty, to disfranchise the electors altogether; the remedy of the electors is by proceedings to compel the performance of the duty; and the statute, being imperative and mandatory, can not be disregarded. The danger, however, of any such misconduct on the part of officers is comparatively small, when the duty is entrusted to those who are chosen in the locality where the registry is to be made, and who are consequently immediately responsible to those who are interested in being registered.

"All regulations of the elective franchise, however, must be reasonable, uniform, and impartial; they must not have for their purpose directly or indirectly to deny or abridge the constitutional right of citizens to vote, or unnecessarily to impede its exercise; if they do, they must be declared void."

And the same text-writer, in his work on Taxation (4th ed.), vol. 4, pp. 3497-3507, says: "A capitation or poll-tax is a tax on the poll without reference to property, business or other circumstances. It is imposed numerically upon citizens without reference to their capacity to sustain the burden. A poll or capitation tax is not a tax upon property but is a tax against the person. However, a poll-tax, although not a tax on property, is nevertheless a tax within constitutional and statutory provisions in relation to taxes. . . Capitation or poll-taxes are generally regarded as a proper means for raising revenue for public purposes. The legislature of a State ordinarily has power to impose a poll-tax, in the absence of direct constitutional prohibition or limitation, and constitutional objections have for the most part been overruled and the imposition of the tax held constitutional. In some States the constitution itself expressly authorizes or levies a poll-tax; but constitutional provisions relating to capitation taxes are generally not self-executing. . . It is generally held that the requirement in a State constitution that taxes shall be equal and uniform does not apply to poll-taxes. . . A poll-tax on males does not violate the con-

stitutional provision because of discrimination on account of sex. . . It is within the power of the legislature to make the payment of poll-taxes a condition precedent to the right to vote."

We have made the above lengthy quotations from Mr. Cooley's works on "Constitutional Limitations" and "Taxation" because in a brief way the principles laid down by the text-writer and the cases cited in the lengthy annotations thereto cover the substantial questions in this record. In addition, see also the following authorities: Frieszleben *v.* Shallcross, 9 Houst. (Del.) 1 (19 Atl. 576, 8 L. R. A. 337); Short *v.* Maryland, 80 Md. 392 (31 Atl. 322, 29 L. R. A. 404); Hawkins *v.* Hawkins, 350 Ill. 227 (183 N. E. 9); United States *v.* Reese, 92 U. S. 214 (23 L. ed. 563); Thurston County *v.* Tenino Stone Quarries, 44 Wash. 351 (87 Pac. 634, 12 Ann. Cas. 314); Peacock *v.* Pratt, 121 Fed. 772, 775; La Belle Iron Works *v.* U. S., 256 U. S. 377 (41 Sup. Ct. 528, 65 L. ed. 998); Pohl *v.* Chicago &c. R. Co., 52 Mont. 572 (160 Pac. 515); Olander *v.* Hollowell, 193 Iowa, 979 (188 N. W. 667); State ex rel. Atty.-gen. *v.* Dillon, 32 Fla. 545 (14 So. 383, 22 L. R. A. 124); 20 C. J. 76, § 37; *McMahon* v. *Savannah,* 66 *Ga.* 217 (42 Am. R. 65). It follows from what is said above that the court did not err in sustaining the motion to dismiss the petition in this case.

*Judgment affirmed. All the Justices concur, except Atkinson, J., absent because of illness.*